### ACTIESSELSKABET ALBIS v. MUNSON.

(District Court, S. D. New York. April 28, 1904.

1. SHIPPING—CHARTER HIRE UNDER TIME CHARTER—LOSS OF TIME WAITING FOR DOCKING.

A time charter for a steamer which was employed in West Indian waters provided that she should be docked, cleaned, and painted at least once every six months if the charterer thought necessary, hire to be suspended until she was again in proper state for service. By a subsequent amendment it was provided that the docking should be done only in United States ports where there were facilities, to which she should be sent by the charterer on his own account, who should also pay for all time lost in shifting ports. The charterer sent the vessel to Mobile to be docked, and on her arrival there notified the master that she was then off time, which notice the master refused to accept, as she had not docked, and could not for want of facilities, the only dock available being out of repair. After a delay of nearly a month she proceeded to New Orleans, where she was docked. *Held*, that the charterer was liable for charter hire during the delay at Mobile, it being his duty under the contract to determine when she should be docked, and to take her to a port where there were facilities.

2. SAME.

The charterer was not relieved from the payment of hire because, while waiting at Mobile for the dock to be put in condition, the owners utilized the time to make some repairs on the vessel, where she remained in a condition to sail on short notice.

In Admiralty. Suit to recover charter hire.

Convers & Kirlin, for libellant.
Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge. This action was brought by the Actiesselskabet Albis, owner of the steamer Albis, to recover a claimed unpaid

balance of hire, amounting to $3,093.51, under extensions of a time charter dated November 17, 1897. The charter was originally for six months from the day of delivery, which was January 20, 1898, but was extended by agreements so that it covered a part of the year 1903. The claim relates to four instalments of hire, due in advance on December 5th and 20th, 1902, and January 5th and 20th, 1903.

The charter provided:

"1.—That the owners shall provide and pay for all the provisions and wages and consular shipping and discharging fees of the Captain, Officers, Engineers, Firemen and Crew, shall pay for the insurance of the vessel; also for all deck and engine-room stores, and maintain her in a thoroughly efficient state, in hull and machinery for the service.

2.—That the Charterers shall provide and pay for all the Coals, Fuel, Port Charges, Pilotages, Agencies, Commissions, and all other charges whatsoever, except those before stated, and shall accept and pay for all Coal in the Steamer's Bunkers on delivery, and the owners shall, on expiration of this Charter Party, pay for all coal left in the Bunkers, each at the current market price at the respective Ports when she is delivered to them.

3.—That the Charterers shall pay for the use and hire of the said vessel at the rate of (£575) Five Hundred & Seventy-five pounds Br. Stlg. per calendar month, commencing on the day of delivery and at and after the same rates for any part of a month; hire to continue from the time specified for terminating the Charter until her delivery to Owner (unless lost) at a port in the United States North of Hatteras.

4.—Payment to be made in cash half monthly in advance in New York at the rate of $4.85 to the £ sterling and in default of such payment or payments as herein specified, the owners shall have the faculty of withdrawing the said steamer from the service of the Charterers, without prejudice to any claim they, the Owners, may otherwise have on the Charterers, in pursuance of this Charter.

5.—That the cargoes shall be laden and/or discharged in any dock, or at any wharf or place that Charterers may direct where she can always safely lie afloat.

6.—That the whole reach, burthen and passenger accommodation of the ship (not being more than she can reasonably stow and carry) shall be at the Charterers' disposal, reserving only proper and sufficient space for ship's officers, crew, tackle, apparel, furniture, provisions & stores.

7.—The Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew, tackle and boats.

8.—That the Captain (although appointed by the Owners) shall be under the orders and direction of the Charterers as regards employment, agency, or other arrangement; and the Charterers hereby agree to indemnify the Owners from all consequences of liabilities that may arise from the Captain signing Bills of Lading, or in otherwise complying with the same.

9.—That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owner shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10.—That the Master shall be furnished from time to time, with all requisite instructions and sailing directions, and shall keep a full and correct Log of the voyage or voyages which are to be patent to Charterers or their agents, and to furnish the Charterers, their Agent or Supercargo, when required, a true daily copy of Log, showing the course of the steamer and distance run, and the consumption of Coal, and to take every advantage of Wind by using the sails, with a view to economize the expenditure of Coal.

11.—That the Charterers shall have the option of sub-letting the steamer, if required by them.

12.—That in the event of loss of time from deficiency of men or stores, breakdown of machinery, stranding or damage preventing the working of the vessel for more than twenty-four running hours, the payment of the hire shall cease until she be again in an efficient state to resume her service and should she

in consequence put into any other Port, other than that to which she is bound, the Port Charges and Pilotages at such Port shall be borne by the Steamer's Owners, but should the vessel be driven into Port, or to anchorage by stress of weather, or from any accident to her cargo, such detention or loss of time shall be at the Charterers' risk and expense.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

17.—Steamer to work night and day if required by Charterers, and all steamer winches to be at Charterers' disposal during loading and discharging, and Steamer to provide men to work same both day and night as required, Charterers agreeing to pay for any night work incurred.

18.—Should Steamer be employed in tropical waters during the term of said Charter Party, Steamer to be docked and bottom cleaned and painted, if Charterers think necessary, at least once in every six months, and payment of the hire to be suspended until she is again in a proper state for the service."

Clause 18 providing for the docking of the steamer was amended January 12, 1899, as follows:

"It is further understood that when it is necessary to dock the steamer charterers agree to send the boat North for their own account."

This provision was also continued in force by extensions dated February 1, 1900, April 9, 1901, and July 7, 1902.

In the last extension, it was provided as follows:

"It is further understood that steamer is to dock only in a United States port where there are facilities, and in case steamer is obliged to shift ports in order to dock and paint, charterers to pay for all time lost shifting ports, also coal consumed and all port charges, same not to vitiate clause 12 in any way."

The charterer ordered the steamer from Cienfuegos to Mobile on the 29th day of November, 1902, to dock and clean bottom. She arrived in Mobile on the 5th day of December following at 1 o'clock P. M., and the charterer notified the master that the steamer was then off time. This notice was not accepted by the master, who insisted that she was still on the charterer's time and would remain so until she could get a dock either at Mobile or at some other place where she might be sent, but no other instruction was given the master and the vessel awaited further orders from the charterer. On the 12th of December, an attempt was made at Mobile to haul the steamer out, when some part of the dock machinery broke and it became necessary to lower the vessel into the water again.

There was only one dock in Mobile where a vessel the size of the Albis could be hauled out. This was a marine railway, belonging to a Mr. Middleton. It was out of condition at the time of the steamer's arrival and remained so until the middle of July, 1903. On the 4th of January, 1903, at 7 o'clock in the morning, the steamer left for New Orleans, where she arrived on the 5th of January at 8 o'clock P. M. and went into dock there on the 6th about 3 o'clock P. M. The docking was finished on the 7th about 4 o'clock P. M.

The main question to be determined is, who was responsible for the loss of time at Mobile. The libellant contends that as the steamer had been ordered there by the charterer and had received no further instructions, the hire continued and the vessel was under no duty to move. The charterer contends that he was justified in ordering the vessel to Mobile and was not bound to consider her on his time until after she

had been docked, and further urges that if he is responsible for the condition of affairs at Mobile, it was the owner's duty to mitigate the damages by causing an earlier docking of the vessel than was attained by her removal to New Orleans.

Clause 3 of the contract required the payment of hire from the day of delivery of the steamer to the charterer until her re-delivery to owner according to the terms of the contract. Unless the charterer can excuse himself by reason of some provision contained in it, he remains liable for the entire hire. Carver's Carriage by Sea, § 572. He claims that under clause 18, as modified by the extensions, he was not required to determine upon the necessity of shifting ports, when it was ascertained that the docking facilities at Mobile were insufficient, but it remained with the owner to decide what to do under the circumstances, and that the loss of time in waiting, was, for that reason, to be borne by the owner.

The language of the contract, however, sufficiently answers the contention. It is provided by clause 18, if the charterer thinks necessary, the steamer should be docked and the bottom cleaned at least once in every six months at the owner's expense. By the extension of July 7, 1902, the docking was limited to a United States port "where there are facilities." As a matter of fact, there were no facilities at Mobile and it was incumbent upon the charterer either to lose the hire for the time consumed in waiting or to find another port. Although it was known to the charterer that the railway was not in order, when the steamer was directed to go there from Cienfuegos, it was expected that the required repairs would be trivial and quickly made and that the railway would shortly be in order. Acting on that belief, the charterer ordered the steamer there and when it was found it would be necessary to send her elsewhere, it was incumbent upon him to give the orders. The detention was apparently caused in the first instance, by the charterer's mistake in sending the vessel to Mobile, which was accentuated by the failure to recognize his liability.

It is contended that the amount of hire should be reduced because it was the duty of the owner to make repairs and some time was consumed at Mobile for that purpose. No doubt the waiting time was, to some extent, devoted to repairs but that fact does not relieve the charterer of his liability for hire. As the steamer was evidently going to be idle, the owner can not properly be charged with the time because the idle days were utilized. It does not appear that the time was necessarily used by the owner. The steamer was all the time in a condition to sail, or could have been made so on a few hours' notice. The condition was not such as to constitute a breakdown, such as would bring clause 12 into operation.

The dispute between the parties seemed, at first, incapable of adjustment, but finally the owner ordered the vessel to New Orleans. It was apparently acting in the interest of the party who should be found liable for the delay, and the charterer was satisfied with its course. In this respect, the owner may be deemed the agent of the charterer.

Decree for the libellant for $3,093.51, with interest.