MORSE DRY DOCK & REPAIR CO. v. MERRITT & CHAPMAN DERRICK & WRECKING CO. et al.

AMERICAN HAWAIIAN S. S. CO. v. MORSE DRY DOCK & REPAIR CO.

(District Court, S. D. New York. October 29, 1907.)

NEGLIGENCE—USE OF UNSAFE APPLIANCES—LIABILITY.

    A derrick company employed by a contractor to lift a piston weighing 4,400 pounds from the engine room of a steamship made fast to two eyebolts which were designed for use in moving the piston inside the engine room and which were sufficient for such purpose. They had been screwed into the piston by the contractor, and used in moving it in the room, and had been left there and the derrick company made fast to them without change, although they were not designed for such use, and were not screwed home, by reason of which when subjected to a lateral strain owing to the triangular form taken by the sling they both broke, permitting the piston to fall and resulting in damage to the other machinery. Different and safer means of attaching the sling were known and in common use. *Held*, that the damage was due to the negligence of the derrick company, which was liable therefor.

In Admiralty.

Armstrong, Brown & Boland, for Morse Co.

Wing, Putnam & Burlingham, for Merritt & Chapman Co.

Wheeler, Cortis & Haight, for American Hawaiian Co.

ADAMS, District Judge. The first action herein was brought by the Morse Dry Dock & Repair Company against the Merritt & Chapman Derrick & Wrecking Company and the American Hawaiian Steamship Company to recover certain damages caused by the falling of the low pressure piston while being removed from the engine room of the Steamship American, belonging to the last mentioned company, in the latter part of August, 1906, said to amount to $4,298.53. The Morse Company, under contract with the American Company, undertook to make certain repairs to the steamship but did not have facilities for lifting the piston and therefore engaged the Merritt Company to do that portion of the work and while the piston was being taken out of

the steamship by the derrick Monarch, belonging to the latter, the eye-bolts which were being used to make the lift broke and let the piston fall, causing the damage complained of. The libellant charged faults as follows:

"On the part of the American Hawaiian Steamship Company:
In that said eye-bolts were defective.
On the part of the Merritt & Chapman Derrick & Wrecking Company.
1st. In that said respondent made fast its hoisting apparatus to two eye-bolts screwed into the said piston, without taking any precautions to avoid an accident should both of said eye-bolts break.
2nd. In that said respondent allowed the whole weight of the piston to come upon the said eye-bolts without providing for additional supports and fastenings.
3rd. In that said respondent improperly subjected the said eye-bolts to a lateral strain in such hoisting.
4th. In that said respondent failed to take the proper precautions against the falling of said piston."

The Merritt Company denied all allegations of fault against it and alleged:

"Seventh. Further answering, this respondent shows that it owns, and rents out on hire, as required, various floating derricks for the work of hoisting loads in and about the harbor.
On the occasion referred to the Morse Company sent for a derrick to do some hoisting on the steamer American. As the American was a high ship, the derrick Monarch (on account of her boom being rigged high) was sent, which is very powerful, capable of lifting loads of over 200 tons. Accordingly the Monarch was let out to libellant, at the rate of $10. per hour, to go to the steamer American at libellant's dock in Brooklyn, and there to hoist out such machinery as should be ordered. The Monarch was fully manned and equipped, in charge of an experienced master, accustomed to all kinds of hoisting, including the removal of machinery, and parts of engines.
Eighth. When the Monarch came alongside the steamer, her master was ordered first to hoist out the shell of the low-pressure cylinder, which was done. The low-pressure piston had been previously removed from this cylinder, and was lying on top of the cylinder-head, which rested upon the other cylinders adjoining. In the top of this low-pressure piston were two eye-bolts already screwed in position for hoisting. These bolts were of the usual size, adequate to lift the piston. The Monarch was then directed to hook on and hoist out this piston. A strong wire fall, with divided wire span, was let down from the Monarch's boom, and the lower ends shackled into these eye-bolts, in the usual and regular way. The Monarch then began to hoist slowly, but as the piston was rising about a foot, a crack showed in one eye-bolt. Although the hoisting was promptly stopped, the eye-bolts successively parted letting the piston fall, which did some damage, all of which happened without any break or defect in this respondent's gear or appliances, and from no fault on the part of this respondent, or its employees."

The American Company denied all allegations of fault against it and alleged:

"Seventh. Further answering the libel, this respondent alleges that through the negligence of the libellant or that of the Merritt & Chapman Derrick & Wrecking Company the piston which was to be lifted from the engine room of the American was not properly made fast to before the lift was started; that the eye-bolts which were used were never intended to sustain the strain put upon them and were not adequate for lifting the piston out of the ship in the manner in which they were used. Said eye-bolts broke, not through any defect, but through the excessive strain to which they were put."

The American Company also brought an action against the Morse Company to recover the value of the time of the said steamship during

which she was detained while the repairs were being made on her, said to have been $3921.87, alleging that by the terms of the contract the Morse Company agreed to provide all tools and appliances and all material required for making the repairs and further:

"Third. As a part of such repairs the respondent agreed to remove the low pressure cylinder from the said steamship safely and without neglect. During the prosecution of said work the respondent undertook to remove the low pressure piston from the cylinder, and without obtaining permission from the libellant, and contrary to its contract with the libellant, appropriated two bolts belonging to the libellant and carelessly and improperly screwed them into said piston.

Fourth. Thereafter the said respondent employed the Merritt & Chapman Derrick & Wrecking Company to lift the said piston out of the ship, and the said respondent, through its agent, said Merritt & Chapman Derrick & Wrecking Company, so negligently raised the said piston that the said piston fell, breaking one of the columns of the low pressure cylinder and the piston follower, damaging the grating around the engine, and doing other serious damage.

Fifth. By reason of the premises it became necessary to put in new parts and to repair the injury done to the said vessel as above stated. The respondent herein has made said repairs and has restored the said steamship to her proper condition, but in making the said repairs, the said respondent detained the steamer for a period of five days five and one half hours longer than would have been required had the repairs contracted for been performed with due care.

Sixth. The value of the said steamship to the libellant at the time that she was delayed was about $750. per day, and the libellant, therefore, lost the sum of $3921.87 through its inability to use the said steamship for the said period, and the said sum of $3921.87 is now due the libellant from the respondent.

Seventh. Said damages to the said steamship were not in any wise caused by any neglect on the part of the libellant, but were caused by the negligence of the respondent through its own acts and those of its agent, in the following and in other particulars, which will be pointed out on the trial.

On the part of the respondent.

(1) In that it did not supply proper means for making fast to the said piston.

(2) In that it did not properly adjust the eye-bolts in fastening them to the said piston.

On the part of the respondent, through the acts of its agent, the Merritt & Chapman Derrick & Wrecking Company.

(1) In that said Merritt & Chapman Derrick & Wrecking Company made fast its hoisting apparatus to two eye-bolts screwed into the said piston, instead of passing a chain through the piston and making fast to a toggle on the underside, as prudence required.

(2) In that said Merritt & Chapman Derrick & Wrecking Company made fast to the said eye-bolts without first screwing them securely into the piston.

(3) In that said Merritt & Chapman Derrick & Wrecking Company improperly subjected the said eye-bolts to a lateral strain in the hoisting.

(4) In that said Merritt & Chapman Derrick & Wrecking Company hoisted the said piston without having properly made fast to it."

The Morse Company duly answered the libel admitting the greater part of the allegations but calling for the original contract and denying the use of the eye-bolts without permission, also denying that the making of the repairs resulted in any detention of the steamship, also denying the 6th paragraph of the libel, quoted above, also denying all allegations of neglect on the part of the Morse Company but admitting

that the damage was caused by the Merritt Company as pointed out in the 7th paragraph of the libel.

The Morse Company also filed a petition to bring in the Merritt Company, making allegations of neglect as follows:

"1st. In that said Wrecking Company made fast its hoisting apparatus to two eye-bolts screwed into the said piston, without taking any precautions to avoid an accident should either of the eye-bolts break.

2nd. In that said Wrecking Company allowed the whole weight of the piston to come upon the said eye-bolts without providing for additional supports and fastenings.

3rd. In that said Wrecking Company subjected the said eye-bolts to a lateral strain in such hoisting.

4th. In that the said Wrecking Company failed to take the proper precautions against the falling of said piston, and in other respects which will be pointed out at the trial hereof.

5th. In that said Wrecking Company ought to have lifted the said piston by means of cables fastened through the hole in the centre thereof, toggled on the other side."

No answer was filed to this petition, it being agreed that the answer filed on behalf of the Merritt Company to the original libel should be regarded as an answer to this petition.

The contract in the matter was as follows:

"**Brooklyn, N. Y.   Nov. 22, 1904.**

Captain W. D. Burnham,
  Gen'l Manager, American-Hawaiian Line, New York City.

Dear Sir:—Replying to your request for approximate estimate to remove old broken L. P. cylinder from engine room of S. S. 'American' and install new cylinder complete: We herewith submit figure of One thousand and eighty (1080.00) dollars. This approximate estimate includes disconnecting cylinder ready to lift on dock, furnishing derrick and lifting out and placing on dock, lifting new cylinder in place and fitting in place and lining up, lagging cylinder with Russia iron and asbestos block, connecting up all piping, using old fittings from old cylinder as far as possible and including any new bolts and packing necessary.

This estimate is made with the understanding that the new cylinder will be finished ready to drop in place, with exception of drilling feet and steam chest. Any work fitting piston and valves and renewing fittings will be additional.

　　　　Yours very truly,　　　　　　Morse Dry Dock & Repair Co.
　　　　[Signed]　　　　　　　　　　　E. P. Morse, Gen'l. Mgr."

It appears that the American was sent to the yard of the Morse Company for repairs. A part of the work to be done was the installing of a new low pressure cylinder and, as a preliminary to this, the piston rod and piston had to be taken out of the old cylinder. This cylinder was the aftermost of three cylinders in the engine room of the steamer. The engine room was about 27 feet 3 inches long and 16 feet wide. It was covered by a sky light which partly extended over a galley in the upper part of the engine room space. The galley extended from forward somewhat abaft of the centre of the intermediate cylinder which was about 24 inches forward of the low pressure cylinder. When the low pressure piston was taken from its place, it was put on top of the intermediate cylinder. This was done by the Morse Company which used the steamer's eye-bolts for the purpose, taking them from the place in which they were hanging in the engine room rack and screwing them in holes already made for follower bolts in the outer side of

the top of the piston. These holes were of the right sizes for the eye-bolts, it being intended that the latter should be used in them in case of necessity.

There has been considerable dispute about the use of these eye-bolts for the purpose of the repairs, the steamship contending that the contract did not call for the use of the ship's tools or gear and that the engineers of the steamer removed all tools from about the engine room, omitting the eye-bolts by oversight, and they were consequently left where the Morse Company could get them. The latter contends that in making the contract it was understood the steamer's gear would be used, as it was customary in such cases and it was within its rights in resorting to them. I do not consider it necessary to go into a discussion upon the subject, as the real controversy turns upon other features of the case, but in passing it may be said it has been fully shown that the eye-bolts were quite sufficient in strength for the purpose to which the Morse Company itself put them, that is lifting out the piston and placing it in a position on the intermediate cylinder for removal through the skylight. In this work the ship's overhead travelling crane, already in the engine room (but removed after the work of disconnecting the cylinder was finished) was used. Nothing but a direct vertical pull was put upon the bolts, which they withstood without injury. Doubtless they would have been of ample strength to withstand, with the same kind of a pull, a much greater weight than that of the cylinder which was only 4,400 pounds, although they were not screwed down to the shoulders by from 1/8 to 3/8 of an inch. Therefore this branch of the case may be passed without further comment.

The Morse Company had no facilities for lifting the piston out of the ship and after the bolts had been used in the manner stated, they were left in position. The Merritt Company, which had been engaged at $10. per hour to do the lifting of the piston, sent its derrick Monarch to the yard for that purpose. The Monarch went alongside of the steamer and extended an arm of her derrick over the engine room. She made fast to the eye-bolts and proceeded to lift the piston out through the skylight. Her boom was swung over the engine room skylight at a height above it of about 18 feet. From this boom she had a fall made of 1 3/8 inch wire in six parts, rove into a large block, which had a sheave 30 inches in diameter. The block at the end carried a sling made up of two wire pennants attached to shackles—large ones upon the block, and smaller ones at the foot—by which to hook the load. The lengths were: pennant 9 feet 4 inches, bottom shackle 5 inches, top shackle 13 inches. Using this machinery, the Monarch first took out the cylinder and landed it on her deck. The men, including some of the Morse Company, then lowered the fall to take out the piston. When the sling had been made fast to the eye-bolts in the piston, a triangle was formed by the pennants and the face of the piston. This made the side of the triangle 12 feet 1 inch in height. The eye-bolts were 63 or 64 inches apart. A round figure of 11 feet has been taken by the expert witnesses as the side of the triangle, and allowing the distance of 63 or 64 inches between the bolts, an angle of the pennants with the perpendicular of about 13° 37′ has been adopted by them. The wire parts of the fall came very near or against the galley,

but when the shackles came to the piston, there was considerable deflection from a vertical lead, consequently when they commenced an attempt to raise the piston, a side or lateral stress was exerted on the eye-bolts. A guy rope was made fast to one of the shackles which held the eye-bolts and men were stationed at this guy in order to prevent the slanting pull of the tackle from swinging the piston too violently when the hoist began. As soon as the derrick began to pull and the piston to rise from the blocks upon which it rested, it tilted and swung off the blocks towards the stern of the steamer. It is claimed that this caused a considerable jar to the tackle. At the same time the piston was twisted so as to bring the eye-bolt to which the guy was fast forward and the other one aft. At this point the eye-bolts gave way, through the breaking of their threaded parts near the shoulders very nearly at the same time, and the piston fell, doing the damage in controversy.

The testimony showed that the bolts were fully sufficient to perform the work they were designed for which was to be done in connection with the ship's overhead crane. They were intended to lift the piston out of the cylinder, not out of the ship, nor for other work. They were of good steel and had never been overstrained so as to weaken them. The officers of the ship had no knowledge that they were to be used in connection with the derrick for swinging the piston out of the vessel and they were so used without the consent of any person authorized to grant it. On this and other occasions they did the work for which they were designed, without accident.

The accident was caused not by any insufficiency on the part of the bolts but by their improper use. They were not fully screwed to their shoulders and while this did not affect them for a direct vertical pull, yet it did very seriously impair their efficiency when a lateral or cross strain was put on them. If they had been screwed home, it is quite doubtful if the accident would have happened even with this strain. No one of the Merritt employees, however, made an examination to see whether they were properly put in the piston.

There has been a great deal of controversy with respect to the jar or shock of the piston, the Steamship Company contending that there was one, and the Merritt Company the contrary. The movement of the derrick fall was slow and doubtless would have been steady if a tilting of the piston when moved from the cylinder head had not occurred but when the strain came towards the stern of the ship, the piston moved aft and as it left the cylinder head and lost its uniform support there, it tipped quite seriously, so that a shock occurred which had a deleterious effect upon the piston.

With respect to the cross strain upon the bolts, it seems to have been well established that there was such. It could scarcely have been otherwise under the circumstances of the angle at which the pennant led from the piston and the additional angle resulting from the tilting of the piston.

The testimony shows that a proper method of getting the piston out would have been by passing a chain through the hole in the centre of the piston and toggling it underneath. There was ample room for this as the piston was resting upon 8 inch blocks. After the breaking of

the bolts here such means, also in putting the new one into the ship, were adopted. Very little or no risk would have been incurred in that way. This is not wisdom after the event. It was known before the occurrence and used afterwards, because previously known. There is testimony on the part of the Merritt Company that eye-bolts were always used by them, also on the part of the Naval authorities that much heavier loads of armor plates were safely lifted with them but doubtless in those cases the bolts were screwed home if given lateral pulls so that the thread of the screw was not subjected to the strain. Here it seems to be clear that the use of eye-bolts in the manner attempted on this occasion was not proper.

The Merritt Company comments upon the non-production of both bolts for examination in court. It appears that they were left upon the steamer but at the time of trial, one only was found. It is suggested from this fact that the other one was suppressed or gotten out of the way by the American Company to conceal a flaw amounting to a gross defect. Immediately after the accident, the bolts were examined and it was concluded that they were sound except for the breaks incident to the accident involved here. After that time there does not seem to be any explanation of the disappearance of one of them but such fact does not amount to what is claimed for it. Moreover, the piston containing the broken off part of the screws was left in the yard of the Morse Company and examined there as late as the 15th of May. Why these were not examined for flaws does not appear and in view of the failure of the Merritt Company to avail itself of such an opportunity to ascertain if any existed in the parts available, the suggestion of suppression does not commend itself.

I conclude that the Merritt Company should be held responsible for the results of this accident. There will therefore be a decree for the libellant against that company, with an order of reference. The libel of the Morse Company will be dismissed as to the American Company. There will also be a decree in favor of the American Company against the Morse Company, with an order of reference. The latter decree to be satisfied in the first instance by the Merritt Company, but this provision is without prejudice to the right of the American Company to recover from the Morse Company should satisfaction from the Merritt Company fail.