## AMERICAN–HAWAIIAN S. S. CO. v. MORSE DRY DOCK & REPAIR CO. et al.

(District Court, S. D. New York. March 2, 1909.)

DAMAGES (§ 106*)—NEGLIGENCE IN PERFORMING CONTRACT—MEASURE.

Exceptions to commissioner's report that the libellant had failed to prove any damages. The evidence showed that the steamer would have sailed if it had not been for the damage repairs on the 8th of September, 1906, and as, owing to such repairs, she did not get away until the 17th, the exception sustained and *held*, that the libellant was entitled to compensation for nine days' detention less the amount it saved by not being obliged to pay overtime charges.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 272; Dec. Dig. § 106.*]

(Syllabus by the Judge.)

See, also, 157 Fed. 274.

Wheeler, Cortis & Haight, for libellant.

Wing, Putnam & Burlingham, for Merritt & Chapman Co.

ADAMS, District Judge. This action was brought by the American-Hawaiian Steamship Company to recover from the Morse Dry Dock & Repair Company and the Merritt & Chapman Derrick & Wrecking Company the value of the time of the steamship American during certain repairs made in the latter part of August, 1906, said in the libel to amount to $3,921.87. It arose out of a state of affairs fully described in the action of Morse Company v. Merritt Company (D. C.) 157 Fed. 274, where it was determined that the Morse Company was entitled to recover its damages, caused by the falling of the low pressure piston of the steamer, from the Merritt Company by reason of its negligence in removing the piston. This action was tried with that action and it was held:

"There will also be a decree in favor of the American Company against the Morse Company, with an order of reference. The latter decree to be satisfied in the first instance by the Merritt Company, but this provision is without prejudice to the right of the American Company to recover from the Morse Company should satisfaction from the Merritt Company fail."

Upon this decision an interlocutory decree was entered as follows:

"American Hawaiian Steamship Company against Morse Dry Dock & Repair Company, and the Merritt & Chapman Derrick & Wrecking Company, Brought in by Petition.

The above entitled cause having come on to be heard on the pleadings and proofs adduced by the respective parties, and having been argued and submitted by the proctors for the respective parties, and due deliberation having been had,

Now on motion of Wheeler, Cortis & Haight, proctors for the libellant, it is Ordered that the libellant herein recover its damages suffered by reason of the matters complained of in the libel, and that it be referred to Herbert Green, Esq., United States Commissioner, to ascertain and report the amount of such damages to the court with all convenient speed."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The claim in the libel was:

"Fifth. By reason of the premises it became necessary to put, in new parts and to repair the injury done to the said vessel as above stated. The respondent herein has made said repairs and has restored the said steamship to her proper condition, but in making the said repairs, the said respondent detained the steamer for a period of five days and one half hours longer than would have been required had the repairs contracted for been performed with due care.

Sixth. The value of the said steamship to the libellant at the time that she was delayed was about $750 per day, and the libellant, therefore, lost the sum of $3,921.87 through its inability to use the said steamship for the said period, and the said sum of $3,921.87 is now due the libellant from the respondent."

On the reference, it was stated:

"Mr. Haight: I claim the vessel was worth $750 a day, and I claimed in my libel only 5½ days, but I shall have to ask for an amendment to the ad damnum, which I believe is allowed up to the amendment" (entry) "of the Decree, to increase the number of days as I get my information now."

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Mr. Haight: Yes. I claim, in accordance with the testimony given by Mr. Blackford, that if the steamer had arrived at the dock on the night of August 29th, when she was expected, her loading would have been completed on the afternoon of September 7th, and that the steamer would have sailed on September 8th, and that the American Hawaiian Steamship Company is entitled to nine days demurrage, at the rate of $530.55 per day, which is the actual net earnings of the steamer on the voyage from New York to Seattle.

Mr. Putnam: I still ask you to give us the days that you claim that we should pay for.

Mr. Haight: I have done so.

Mr. Putnam: I don't think you have.

Mr. Haight: That she should have sailed on the 8th and did not sail until the 17th; a total of nine days."

Thereafter the commissioner made a full report. In concluding he said:

"Libellant's whole case consists of little more than assertions that if the accident had not happened, the other necessary work would have been rushed, some of the work actually done would not have been undertaken, the ship would have sailed leaving other portions uncompleted, the inspection would have been hastened, and the ship would have been loaded and despatched with a speed unusual in libellant's business. I regard all this as too vague, doubtful and conjectural to found a decree upon. No claim was made for damages for detention while the ship was repairing, and apparently no intimation was given that such a claim might be made. Mr. Mills admits that he did not request Morse to hurry the accident work, or complain that it was delaying the ship. If the Morse Co. had been under a time limit by its original contract, with a per diem penalty clause, it is very doubtful that libellant could have recovered penalties in view of all the additional work it ordered, both originally and from time to time as the repairs proceeded up to the very end, without a suggestion that it would claim damages for delay. If libellant's silence and orders for additional work would not have operated as a waiver, it would seem that they would at least have been regarded as an implied extension of the time on its part. Under the facts here, I do not see why the Morse Co. is not in a position at least as good as that, nor do I see why the Merritt & Chapman Co. should occupy a worse position. The liability of the one is no broader than that of the other, although primarily it rests upon the Merritt & Chapman Co. My conclusion is that libellant has failed to prove that the ship was detained by reason of the accident.

To enable the court to dispose of the case finally in the event of the above conclusion not being sustained, it is proper that I should find the rate of damages which libellant would be entitled to recover. Computations were

submitted purporting to show that the net daily earnings of the ship on her west bound voyage, the one in question, were $530.55 per day, and upon a demand of the respondent, similar computations were presented as to the return of east bound voyage, and these showed net daily earnings of $394.84. The accuracy of these computations has not been questioned. The daily average for the two voyages was $426.28. Upon the reference it was contended that the last mentioned rate would apply, but the question has not been discussed in respondent's brief. I do not see why the east bound voyage should be considered, any more than the next following, or successive voyages subsequently made. Each voyage was separate and distinct. If the ship was detained, I think that she would be entitled to recover the net earnings which she would have made during the days of detention. I therefore find the rate to be $530.55."

On the 8th of February, 1909, the libellant duly excepted to the report, pointing out in detail the errors relied upon.

It is claimed that if the piston had not been dropped by the Merritt & Chapman Company the vessel would have sailed early on the morning of September 8th.

It appears that the repairs to the vessel, other than those caused by the accident, were of two kinds, viz.: a special contract relating to the low pressure cylinder, which had been made a year or more before, and the incidental repairs which are nearly always made while a vessel is in port. When the contract was made, it was agreed that the work should be done while the vessel was engaged in discharging and loading. On this occasion, the vessel arrived at the repairing place on the 24th of August and was docked about 3:30 p. m. of that day. The testimony shows that the time covered from the date of arrival to September 7th would have given the Morse Company ample time to make the repairs and it is proved explicitly that it agreed to make the repairs 'n about ten days. It was testified that when the accident happened, all the work was purposely delayed because the company had such a long time to make the accident repairs that it centered all its force upon that work and got it out before it started on the general repair work. It was shown that no jobs of the latter would have interfered with the former and sufficient men could have been employed to do them all. It was principally overhauling and not actually necessary to do the work before the vessel put to sea.

It appears also that the loading would have been completed before September 8th. The time that it actually took to load this particular cargo was 103½ hours. When the accident occurred and it appeared that the vessel would be detained a long time in port, the libellant saved the expense of loading overtime and on holidays, amounting to $609.04. There was no question that the cargo would have been ready to load. It was the libellant's duty to mitigate damages and an avoidance of incurring the expense of overtime and holiday loading was in this direction.

It was the intention of the libellant that the vessel should sail September 8th. It had no regular days for sailing, they varying from 16 to 35 days apart, but as soon as one of its vessels arrived in port, a sailing day for her was fixed and shippers were notified accordingly.

Other matters were taken into consideration in fixing the day, the regular insurance for example, covering that period. Orders were given to load as soon as the steamer docked. When the time for sailing

was originally fixed for September 8th, an entry to that effect was made in red ink on the freight engagement list. When the accident occurred shippers were notified to hold their freight back and subsequently the sailing date was fixed for September 15th, when it was expected the repairs would be completed.

The loading was started with no overtime work, the only time it was ever done. The testimony shows that this was because of the accident.

The libellant hurried the work in all possible ways. In obtaining the new column, for example, they sent it by express to the Morse Company.

Some consideration has been given by the commissioner to the loading time of the libellant's other vessels and he argues therefrom that the time used here was not exceptional, but I am unable to agree with his reasoning. The circumstances were quite different. This was an unusually light and bulky cargo, 6,097 tons. There were often as much as 10,000 tons, and it does not follow that the time required for loading should have been as great. Comparisons based upon quite different situations are evidently of little value and in any event do not prove that this steamer would not have completed her loading, apart from the accident, by the 8th of September.

Comment has been made by the commissioner on the fact that other work was done by the libellant, while the ship was waiting and that the ship's engineers and part of her crew, during the time, were engaged in repair work and probably his decision was influenced thereby. The utilization of a vessel's idle days, however, does not create a right to defeat a claim for detention. Actiesselskabet Albis v. Munson (D. C.) 130 Fed. 32, affirmed 139 Fed. 234, 71 C. C. A. 360. It was not necessary to the libellant's recovery to prove that the crew remained idle during the period of waiting.

The construction of 2 deck houses by Morse & Co. for the libellant is also mentioned by the commissioner, but it has been shown that this work was done under a general contract and was not to be used until the vessel went into a new service. As a matter of fact this building did not in the slightest degree retard the sailing.

Other repairs outside the contract were also mentioned by the commissioner and possibly had some effect in bringing about his decision, but what has been said just above is equally applicable here. They were the ordinary ship's repairs which kept coming up day by day but in no way caused any delay.

Some argument has been made that a cause of delay was the inspection of the vessel by the Local Inspectors. There was no legal necessity for an inspection before October 18, 1906, as the vessel had been inspected on that date in 1905. It is provided that certificates of inspection shall not be issued for any period less than one year—General Rules and Regulations of the Dept. of Commerce and Labor 1907, p. 107—but it is customary in cases of necessity to anticipate the time. It is clear that the inspection in this case could have been made before September 8th, if necessary, but it was more convenient to do it when there was steam in the boilers. The delay until just before sailing was

more economical and in conformity with the libellant's policy of avoiding needless expense.

Taken altogether, the testimony is very persuasive that the libellant is entitled to demurrage. It had use for the vessel, it was very careful to provide that there should be no detention beyond the date mentioned. It was the invariable custom of the libellant to despatch its vessels as soon as loaded and if instructions had not been given to hold back the freight, a full cargo would have been provided in the ordinary course. Profitable employment for the vessel was at hand. The libellant's agent was very explicit about not wanting the vessel detained by the putting in of the new cylinder, to which the Morse Company agreed, also that the work should not take more than ten days, that is, to September 6th. That the fifteen days' time required for loading would be up the 8th was noted by the traffic manager, and it seems that there can be no reasonable doubt that sailing was intended on that date.

Although the damage work was repaired promptly, it was not completed until 3:45 p. m. September 16th, but the vessel was delayed until the 17th, testing the engine room work, incidental to the piston damages.

Even assuming that the commissioner was justified in considering the question of a waiver or extension of time, I fail to find any evidence which would justify a conclusion that there was either by the libellant.

The steamer would have sailed, if it had not been for the damage caused by the falling of the low pressure piston, on the 8th of September and as through the detention, due to the damage, she did not sail until the 17th, there was a demurrage delay of 9 days caused by the respondents. That would entitle the libellant to $4,774.95, but as it saved $609.04 in overtime in loading, that amount should be credited, leaving a balance of $4,165.91, for which a decree may be entered.